**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv259**

| | | |
|---|---|---|
| **PRECISION COMPONENTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| | ) | |
| **C.W. BEARING USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Partial Summary Judgment [Doc. 30], filed July 25,2007 and the Plaintiff's

Motion for Partial Summary Judgment [Doc. 39], filed August 27, 2007.

**PROCEDURAL HISTORY**

On September 7, 2005, the Plaintiff Precision Components, Inc.

(Precision) sued Defendant C.W. Bearing USA, Inc. (Bearing) and two

individual Defendants, Christine Smith and Wendy Taylor, in the General

Court of Justice, Superior Court Division, Mecklenberg County, alleging

state law claims for conversion, civil conspiracy, unfair and deceptive trade

practices, claim and delivery and injunctive relief. [Doc. 1-2]. On September 12, 2005, the Plaintiff filed a First Amended Complaint in which it dropped Christine Smith as a defendant, added James Coble as a defendant, and asserted an additional claim for attachment. [Doc. 1-5]. On November 1, 2005, the Plaintiff filed a Second Amended Complaint in which Smith was returned as a Defendant and Coble was dropped as a Defendant. [Doc. 18-3]. In addition, the claim for attachment was dropped. [Id.]. The case remained pending in state court, where discovery was conducted, until June 22, 2006 when the Defendants filed a Notice of Removal alleging that on June 9, 2006, they learned through an expert's report that the Plaintiff would seek damages for patent infringement. [Doc. 1, at 2]. As a result, Defendants asserted federal question jurisdiction. [Id]. Defendants simultaneously moved for leave to file an amended answer and counterclaims. [Doc. 4].

The Plaintiff moved to remand the action to state court, arguing that no federal question jurisdiction existed because only state law claims had been alleged. [Doc. 9].

On August 17, 2006, the Defendants' motion for leave to amend was granted and the Amended Answer and Counterclaims was filed that same date. [Docs. 13 & 14]. Defendant Bearing asserted counterclaims for

common law conversion, and seeking a declaratory judgment that the alleged patent at issue is invalid, that no infringement has occurred, and seeking injunctive relief. [Doc. 14].

On September 6, 2006, a Pretrial Order and Case Management Plan was entered requiring that discovery be completed by May 14, 2007 and that motions be filed no later than July 31, 2007. [Doc. 17]. Those deadlines were subsequently extended to September 11, 2007 and November 28, 2007 respectively. [Doc. 24].

In March 2007, the motion to remand was denied based on the finding of Hon. Frank D. Whitney that the Plaintiff's state law claims would require a determination of substantial questions of patent law. [Doc. 26].

Bearing filed its motion for partial summary judgment in July 2007. [Doc. 32]. On August 14, 2007, the parties filed a Stipulation of Dismissal with Prejudice as to Defendants Christine Smith and Wendy Taylor.[1] [Doc. 34]. The Plaintiff then cross-moved for partial summary judgment in August 2007 as to Defendant's patent invalidity and non-infringement claim. [Doc. 39].

On September 18, 2007, the parties filed a Second Stipulation of

---

[1]At that point, there was complete diversity between the Plaintiff and the Defendant. 28 U.S.C. §1332.

Dismissal with Prejudice as to Certain Claims Only. [Doc. 43]. As a result, the only claims of the Plaintiff remaining in the action are for conversion, civil conspiracy and unfair and deceptive trade practices in connection with the information contained within U. S. Patent No. 6,939,052 (the '052 Patent). [Id.]. All claims for injunctive relief were dismissed as were all claims relating to theft of customer information or any other intellectual property. [Id.]. On that same date, the case was reassigned to the undersigned.

To the extent that the parties' cross-motions for summary judgment address claims which have been dismissed, no discussion thereof will be provided.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the [administrative record] show[s] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the

evidence could return a verdict for the nonmoving party.  Shaw v. Stroud,

13 F.3d 791, 798 (4th Cir. 1994), *certiorari denied* 513 U.S. 814, 115 S.Ct.

68, 130 L.Ed.2d 24 (1994), *citing* Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  "Regardless of

whether he may ultimately be responsible for proof and persuasion, the

party seeking summary judgment bears an initial burden of demonstrating

the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at

522, *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548,

2553, 91 L.Ed.2d 265 (1986).  If this showing is made, the burden then

shifts to the non-moving party who must convince the Court that a triable

issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment
>
> "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

Id.

_____Nonetheless, in considering the facts for the purposes of a summary

judgment motion, the Court will view the pleadings and material presented

in the light most favorable to the nonmoving party.  <u>Matsushita Electric</u>

<u>Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986).


## UNDISPUTED FACTS

David Hull (Hull) is the President and sole shareholder of Precision.

[Doc. 38-2, at ¶1].  Precision is an engineering and sales agent for the

distributors and manufacturers of industrial products, including ball

bearings. [<u>Id</u>., at Exhibit B].  On January 27, 2003, Hull applied for a patent

for a ball bearing mounting technique. [Doc. 18-3, at ¶¶69-70].   A federal

patent, "Bearing with Integrated Mounting Features," the '052 Patent, was

issued on September 6, 2005, in Precision's name. [<u>Id</u>., at ¶¶70-71].

Defendant Bearing is owned by Cixing Group Co., Ltd. (Cixing), "its

Chinese parent company." [Doc. 14, at ¶11].  Bearing sells, distributes and

markets ball bearings. [Doc. 38-2, at Exhibit B].  On July 30, 2004, Cixing

applied in China for a patent for "Externally Positioned Bearing," for which it

received a patent, Patent Number ZL 2004 2 0081621.9 (the Chinese

Patent), on August 3, 2005. [Doc. 42-2, at 22; Doc. 18-3, at ¶88].

Hull alleges that the Chinese Patent was issued as a result of the

theft or use of confidential information related to his patent. [Doc. 42-8, at

3]. Hull has averred that in February 2003, less than one month after he filed for his patent, he approached Lirong Hu, Vice-President of Bearing, "about the possibility of purchasing my invention. I told them that I had this patent which would allow them to get into a production niche." [Doc. 38-2, at ¶7]. Hull offered to sell it to Bearing for two million dollars plus five percent of the gross sales worldwide. [Id.].

In December 2003, Hull went to China where he met with Cixing engineers "to explain to them how the invention worked." [Id., at ¶16]. Hull testified in his deposition that among the engineers was Han Chun Wei who later filed "my patent in China, declaring himself as an 'inventor' and filing the patent on behalf of Xiangen Hu," the president of Bearing and Cixing. [Id.].

During a second meeting in December 2003, Hull again offered to sell his patent for two million dollars plus five percent royalties. [Id., at ¶17; Doc. 42-8, at 5]. Hull has testified that in the course of these meetings, he divulged the intricate workings of his patent to the Cixing employees, including Wie. [Id.]. Hull testified that he was "rather specific about the design and the applications and the benefits and the customers. And the meeting about the money was with Mr. [] Xiangen [Hu] and Lirong [Hu]." [Id., at 19]. Hull "divulged" the patent "and the intricate workings of that

patent" but did not ask anyone to sign a confidentiality agreement. [Doc. 30-3, at 105-06].

At the time of these meetings, Hull had been in a long term working relationship with Bearing and had a contract pursuant to which he had the exclusive rights to sell their bearing products. [Doc. 42-8, at 6]. Hull claims that both Lirong Hu and Xiangen Hu told him they were interested in the patent. [Doc. 38-2, at ¶19]. In April or May 2004, Hull received a new "Independent Contractor & Consultant Agreement" from Bearing by which he claims he was to transfer his patent to Cixing and to agree to reduced compensation. [Id., at ¶¶20-22; Exhibit B attached]. Hull interpreted the agreement as allowing him to continue to sell Bearing's products but only if he transferred his patent for no consideration.[2] [Id.]. Hull rejected the contract. [Id., at ¶23].

As noted above, the Chinese Patent was issued in August 2005. Hull testified that the Chinese Patent precludes him from having the product covered by his patent manufactured in China. [Doc. 42-8, at 7]. He also testified that there had been a potential that Precision would have filed its '052 Patent in China. [Id.]. Hull admitted however that when the '052

---

[2] The copy of the agreement attached to Hull's affidavit is incomplete. [Doc. 38-2, at Exhibit B]. The portions which are contained within Exhibit B do not support Hull's contentions. One paragraph refers to work product but does not identify the '052 Patent. [Id.]. Nor does the document contain any provisions relating to compensation.

Patent issued, he was notified by the United States Patent and Trademark Office and his patent attorney that he had permission to file his patent in foreign countries as of March 10, 2003. [Id., at 8].  Although Hull did not remember doing so, the document notifying him of this right showed that he requested that his patent not be published and certified to that Office that he would not file the patent in any foreign country. [Id.].  In fact, he signed the following certification: "I hereby certify that the invention disclosed in the attached application has not and will not be the subject of an application in another country." [Doc. 30-3, at 109].  Hull also received a letter from his patent attorney advising:

> Under various international treaties, corresponding foreign patent applications filed in signatory countries within one year of the above-noted filing date of this U.S. application will be accorded retroactively the same filing date as the U.S. application, which may be important in that a publication or use of the invention anywhere before the first filing date is a bar to filing in many foreign countries, and also the file date may be important in determining the patentability of this invention in foreign countries over any intervening prior art.  We will contact you several months prior to the first anniversary of this U.S. application's filing date to remind you about possible foreign patent applications.

[Id., at 109-110].

Hull acknowledged that he knew about the one year period. [Id., at 111; Doc. 42-8, at 9-11].  He also admitted that he at no time filed his patent in China or any other foreign country. [Id.].  Hull also acknowledged

that the Chinese Patent did not issue until after that one year period had run. [Doc. 30-3, at 111].  Hull testified that

> the defendants say that we had no intention for filing for a Chinese patent.  That is absolutely true. ... [F]iling a patent there would [not] have done us any good to protect our invention.  In fact, just the opposite is true.  There is virtually no protection in China for Americans filing patents there.  So we had considered and researched this question and had determined that filing a patent there would have actually destroyed the value of our US patent.  This is because of the big problem with copycatting in China, whereas Chinese Intellectual Property Copycats, once a patent or copyright has been filed there by an American, simply look at it–as it becomes a matter of public record–reverse engineer it–and then file it themselves in China.  Unfortunately, this happened in any event with a company we made the mistake of trusting.

[Doc. 38-2, at ¶¶27-30].

Hull admitted that he voluntarily disclosed confidential and proprietary information to Cixing in order to try to induce them to purchase his patent. [Doc. 42-8, at 13].  He claims, however, that Cixing did not have a right to use his information to file for the Chinese Patent. [Id.].

> They have made the patent worthless by patenting it in China, because I can no longer manufacture the product in China. ... [B]ecause they stole the patent from me, and patented it in China, they essentially render[ed] it worthless, so I can no longer have the product made in China.  Making it anywhere else in the world is relatively ineffective, from an economic standpoint.

[Id.].

As previously noted, Hull admitted that Precision has not attempted

to register or publish the patent in any other country. [Id., at 16]. Hull also testified that he did not know how Cixing got the information, whether it was "stolen or was given." [Doc. 30-3, at 103]. "I don't know how they got the information, but before they filed a patent, I did offer to sell it to them." [Id.]. "[T]he [Cixing] patent very methodically copies portions of my patent and the samples that I gave to [Cixing] before they filed the patent." [Id.]. Likewise, Hull was unable to explain in what manner, if any, Bearing, as opposed to Cixing, participated in any such misappropriation of the patent. [Id., at 113-114].

Hull has asserted that in January 2005, Bearing made quotations to a company known as Emerson in the United States "for the sale of my patent[.]" [Doc. 38-2, at ¶31; Exhibit C; Doc. 38, at 14]. The document in question is a quotation by Bearing to produce bearings for Rencol Company in the United Kingdom. [Id.]. Hull alleges "upon information and belief" that the part number for the bearings was his invention even though there is nothing in the record to support this. [Id.]. He also acknowledges in his affidavit that "the deal [did not] go[] through[.]" [Id., at ¶33].

# IV. DISCUSSION

## A. Defendant's Motion for Partial Summary Judgment.

## 1. Claim for Conversion

Defendant Bearing moves for summary judgment regarding Plaintiff's state law claim for conversion. First it is necessary to determine what is encompassed in this claim. In its Second Amended Complaint the Plaintiff claims conversion of "valuable customer files." [Doc. 18-3 at 21]. It makes no claim therein as to conversion of any patent information any property rights associated with the patent. In their Stipulation of Dismissal, however, the parties have agreed to the Plaintiff's dismissal with prejudice of any claim for conversion "to the extent that [it] relate[s] to the alleged taking of confidential information of the Plaintiff other than the information related to and contained in [the '052 Patent]." [Doc. 43]. This would appear to dismiss all of the conversion claim that is alleged in the Second Amended Complaint. No amendment to the Second Amended Complaint has either been sought or granted to allege conversion of anything other than customer files. Nonetheless, the parties' Stipulation of Dismissal goes on to state that "It is the intent of the parties that . . . the First Claim for Relief (Conversion), . . . will remain with respect to the information related to and contained in [the '052 Patent]." [Doc. 43]. The Court thus

feels compelled to treat this language in the Stipulation of Dismissal as a stipulation to amend the Second Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, albeit in a very vague fashion, to include allegations of conversion "of the information related to and contained in" the '052 Patent.

Having made such a valiant attempt to have the Defendant acknowledge that a claim for "patent information conversion" is pending as part of the First Claim for Relief, the Plaintiff then makes essentially no effort to defend the claim against the Defendant's summary judgment motion. Precision makes no legal argument concerning this claim for conversion. In fact, Precision's attorney acknowledges that

> [f]or the most part, this is a straight-up summary judgment motion that is fact dispositive. There is very little question on opposing points of law. The parties' briefs do not, for example, contain dueling arguments, over the application of this Supreme Court case or that court of appeals case, etc.

[Doc. 38 at 15]. Thus, Precision has presented nothing in opposition to the case law cited by Bearing. <u>Bouchat</u>, 346 F.3d at 522. Instead, the Plaintiff has conceded that Bearing's statement of the law is correct.

In an "Introduction" to his Brief in Opposition to the Defendant's Motion for Summary Judgment [Doc. 38], Plaintiff's counsel engages in a lengthy diatribe against Cixing and Bearing with no citation to any part of

the record or any evidence contained therein, except for the Affidavit of Plaintiff's president.  Then, no argument is made that the allegations set out in the Affidavit establish a cause of action for conversion.  In addition, attached to the brief are copies of articles concerning the pirating of intellectual property in China, articles which Precision argues show that Cixing and Bearing stole the patent at issue.  These articles do not even mention Cixing or Bearing, and reveal nothing connected to the facts of this case.  Precision has not offered an explanation as to how these documents are admissible, and Bearing has objected on the grounds of hearsay.  The undersigned has no choice but to exclude them.  <u>Gantt v. Whitaker</u>, 57 Fed.Appx. 141, 150 (4th Cir. 2003) ("This circuit has consistently held that newspaper articles are inadmissible hearsay to the extent that they are introduced 'to prove the factual matters asserted therein.'") (citations omitted); <u>Md. Highways Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1251 (4th Cir. 1991), *certiorari denied* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

Besides the fact that Precision completely failed to oppose summary judgment as to the conversion claim in a proper manner according to the

Rules of Procedure with evidence and argument, the claim for conversion of the patent must fail as a matter of law. North Carolina law defines conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C.App. 390, 414, 537 S.E.2d 248, 264 (2000), *review denied* 353 N.C. 378, 547 S.E.2d 14 (2001) (citations omitted). "In North Carolina, only goods and personal property are properly the subjects of a claim for conversion." Id. "[I]ntangible interests such as business opportunities and expectancy interests [are not] subject to a conversion claim." Id.; TSC Research, LLC v. Bayer Chemicals Corp., 552 F.Supp.2d 534, 542-43 (M.D.N.C. 2008) (only tangible property is subject to conversion under North Carolina law). An "intangible asset" or interest is "an asset that is not a physical object, such as a patent, a trademark or goodwill." Edmondson v. American Motorcycle Ass'n, Inc., 7 Fed.Appx. 136, 148 (4th Cir. 2001) (applying North Carolina law); Southern Bancorporation, Inc. v. C.I.R., 847 F.2d 131, 137 n.6 (4th Cir. 1988) (examples of intangible assets include patents); State *ex rel.* Utilities Commission v. General Tel. Co., 281 N.C. 318, 369, 189 S.E.2d 705, 738 (1972) (noting that patents are intangible assets of corporations).

Since the "thing" the Plaintiff claims was stolen was not a tangible asset, and thus was not subject to being converted, the Defendant's motion for summary judgment as to the conversion claim must be granted.

## 2. Claim for Unfair and Deceptive Trade Practices

Plaintiff's Third Claim for Relief is a state law claim alleging that the Defendant violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C.Gen.Stat. §75-1.1, "with respect to the information related to and contained in" the '052 Patent. [Doc. 43].

> Whether an act found by the jury to have occurred is an unfair or deceptive practice which violates N.C.G.S. §75-1.1 is a question of law for the court. "Ordinarily it would be for the jury to determine the facts, and based on the jury's finding, the court would then determine as a matter of law whether the defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce."

Ellis v. Northern Star Co., 326 N.C. 219, 226, 388 S.E.2d 127, 131 (1990) quoting Hardy v. Toler, 288 N.C. 303, 308-09, 218 S.E.2d 342, 345-46 (1975) (internal citations omitted). In order to establish a claim for unfair and deceptive trade practices, a plaintiff must show: "(1) that [the defendant] committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to defendant." Bob Timberlake Collection, Inc. v. Edwards,

176 N.C.App. 33, 41, 626 S.E.2d 315, 322-23, *review denied* 633 S.E.2d 674 (2006) (citation omitted). "An act or practice is unfair if it 'is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' An act or practice is deceptive if it 'has the capacity or tendency to deceive.'" Id. (citation omitted).

Precision has alleged in its Second Amended Complaint that the information which led to its patent application was stolen by employees of Bearing at some undisclosed point in time. [Doc. 18-3 at ¶82]. During his deposition, however, Plaintiff's president Hull testified that he filed his patent application in January 2003. At the time he filed his application, he certified that he had no intention of filing the patent in any foreign country, nor did he ever do so. Less than one month later, Hull began talks with Bearing and Cixing about his invention in an attempt to sell the patent to them. Hull admitted during his deposition that he voluntarily disclosed the "intricate workings" of his patent to Cixing engineers and employees in China in December 2003 in a further attempt to sell the patent to Cixing. Moreover, he provided them with samples of the invention. [Doc. 38-2 at ¶¶11, 12]. At no point did Hull seek a confidentiality agreement from either the Defendant or Cixing. Although a proposal for a new distribution contract containing an assignment of the '052 Patent to Cixing was sent to

Hull, it was never signed. When pressed in his deposition about what evidence he could adduce showing the Defendant had done anything unfair or deceptive regarding the patent information, the following exchange occurred,

Q: In this case, you are suing C.W. Bearing USA, which is a U.S. corporation, for some patent that was filed by a Chinese corporation. Your allegations in the Complaint are that C.W. Bearing USA took that and sent it to the parent corporation in China so they could file the patent. You just testified you voluntarily disclosed it to the parent corporation. So *what did C.W. Bearing USA do to misappropriate your patent?*

A: Unfair is deceptive trade practices.

Q: What does that mean? *What did they do?*

A: They took confidential information. They used it for their economic benefit. It's called economic espionage, for one thing.

Q: How? What did they do?

A: They stole intellectual property from my company and used it for economic gain.

Q: *How did C.W. Bearing USA steal it? You voluntarily disclosed it to Cixing.*

A: *But they had no right to file it in China*.

Q: *You have no evidence that C.W. Bearing stole your patent information, do you?*

A: *I haven't been able to look at the data on the computers*.

Q:    *You're not aware, sitting here today, of any evidence that C.W. Bearing misappropriated your patent information, are you?*

A:    *I'm aware that they filed a patent in China that is strikingly a copy of mine.*

[Doc. 30-3 at 113-14].  As such, Plaintiff concedes that it is not basing its Unfair and Deceptive Trade Practices claim on the stealing of the patent information, but solely on the filing of the Chinese patent by Cixing.

While normally the jury would make the determination of whether certain acts occurred, summary judgment is not always precluded in cases alleging unfair and deceptive trade practices.  Tucker v. Boulevard At Piper Glen, LLC, 150 N.C.App. 150, 153, 564 S.E.2d 248, 250-51 (2002). Where a defendant shows that an essential element of the plaintiff's claim is nonexistent and the discovery shows that the plaintiff cannot produce evidence to support an essential element, then summary judgment is proper.  Id.

Plaintiff's new-found basis for its Deceptive Trade Practices claim presents three problems for the Plaintiff.  First, Plaintiff presents this Court with only speculation and no evidence tying the filing of the Chinese patent to the Defendant, except that the Defendant is owned by Cixing.  Without that link the Plaintiff's forecast of evidence fails to provide any basis for

Defendant's liability on this claim. Second, the Second Amended Complaint as modified by the Stipulation of Dismissal limits the Plaintiff's Unfair and Deceptive Trade Practices claim to one "with respect to the information related to and contained in [the '052 Patent]." [Doc.43]. Plaintiff's pleadings continue to assert no claim based upon the wrongful filing of some Chinese patent. Third, Plaintiff fails to present any form of legal authority, whether state, federal or Chinese, that indicates that the filing of the Chinese patent by Cixing was in any way wrongful. Defendant presents authority showing that if Plaintiff had sought registration of the patent in China within one year of the issuance of the '052 Patent in the United States that such Chinese re-issue of the patent would relate back to the date of Plaintiff's application to the United States Patent Office, thus precluding any Chinese filing by Cixing. Plaintiff offers nothing to refute this. The uncontroverted evidence, however, is that the Plaintiff purposely chose to forego the filing of its patent in China. As such, the Plaintiff's Chapter 75 claim based on the filing of the Chinese patent must fail.

Even if the Plaintiff had preserved a claim and presented a forecast of evidence of a wrongful or deceptive act on the part of the Defendant connected to the procurement of the patent information, such claim would still fail. The uncontroverted evidence demonstrates that Precision cannot

show that any such act (whether committed by Defendant or by Cixing) proximately caused any cognizable injury. <u>Melton v. Family First Mortgage Corp.</u>, 156 N.C.App. 129, 136, 576 S.E.2d 365, 370, *affirmed* 357 N.C. 573, 597 S.E.2d 672 (2003) (assuming the unfair act took place, no evidence that act proximately caused actual injury). The evidence is undisputed that Hull voluntarily disclosed his patent to Cixing in December 2003. Cixing's application for its Chinese patent was not made until July 2004. As such, the Chinese patent about which Plaintiff complains was secured based upon information that Plaintiff's president voluntarily disclosed directly to Cixing. Even if that same information were somehow stolen, such theft did not cause the damage resulting from the filing of the Chinese patent. That is attributable to Plaintiff's own act. <u>Griffith v. Glen Wood Co., Inc.</u>, 184 N.C.App. 206, 217-18, 646 S.E.2d 550, 558-59 (2007) (plaintiff admitted in deposition that his idea was readily ascertainable; summary judgment appropriate). "These allegations fail to establish that [Precision] has suffered any legally cognizable damage as a result of [Bearing's] acts." <u>Tucker</u>, 150 N.C.App. at 153-54. "Discovery [showed] that plaintiff cannot produce evidence to support the essential element of some injury or damage proximately caused by defendant's allegedly unfair or deceptive acts." <u>Id</u>. As a result, summary judgment is appropriate.

Rowell v. North Carolina Equipment Co., 146 N.C.App. 431, 435, 552 S.E.2d 274, 277 (2001); Dull v. Mutual of Omaha Ins. Co., 85 N.C.App. 310, 314, 354 S.E.2d 752, 754, *review denied* 320 N.C. 512, 358 S.E.2d 518 (1987) ("Admittedly, there are many facts about which the parties disagree, however, none of these facts are material to our decision.").

Moreover, as with the claim for conversion, Precision's brief in opposition presents no legal argument. Instead, Precision has conceded the statement of law contained within Bearing's brief. Nor did Precision point to any genuine issue of fact in response to the motion. Instead, it relied on vehement arguments about what "must have occurred" without any citation to the evidence. In short, Precision failed to respond to the motion for summary judgment in a manner consistent with the Rules of Civil Procedure in order to avoid the entry of judgment on this claim. For these reasons the Plaintiff's state law claim for unfair and deceptive trade practices will also be dismissed.

## 3.  Claim for Civil Conspiracy

Bearing also moved for summary judgment as to the claim for civil conspiracy. "There is no independent cause of action [in North Carolina] for civil conspiracy." Sellers v. Morton, __ N.C.App. __, 661 S.E.2d 915, 922 (2008), *quoting* Toomer v. Garrett, 155 N.C.App. 462, 483, 574 S.E.2d

76, 92 (2002), *review denied* 357 N.C. 66, 579 S.E.2d 576 (2003).  "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." Id. (other citations omitted).  The two claims upon which Precision relies, conversion and unfair and deceptive trade practices, fail to survive summary judgment.   The Plaintiff has dismissed all other claims in the Stipulation of Dismissal.  Since both underlying claims are dismissed, the claim for civil conspiracy must fail as well.


**B. Plaintiff's Motion for Partial Summary Judgment as to Defendant's Counterclaims**

Defendant presents three counterclaims**:** 1) conversion of certain assets belonging to Defendant in North Carolina, 2) for an injunction preventing interference with Defendant's conduct of its business and 3) for declaratory judgment that Plaintiff's patent is invalid and/or unenforceable and that the Defendant has not infringed or caused any infringement by another. [Doc. 14].  Plaintiff has moved for summary judgment only as to the third of these claims, the patent-related declaratory judgment claim. [Doc. 39].

The basis of Plaintiff's argument is that Defendant's patent related

counterclaims are "immaterial to Precision's state-law claims" in that

Precision has never threatened suit for infringement or even alleged

infringement. In support of the motion, Precision's counsel has stated:

> Precision has not accused CW Bearing or Cixing of patent infringement, and indeed could not, because Precision lacks any information indicating that CW Bearing or Cixing has committed an act of infringement in the United States. Because the force of a U.S. patent only extends to the territorial jurisdiction of the United States, CW Bearing or Cixing is free to manufacture these bearings in China and to sell them anywhere other than the United States. This is entirely consistent with Hull's and Precision's intentions. *However, Cixing's fraudulent Chinese patent, founded on secret information stolen from Precision, prevents Precision from having these bearings made in China for import into the United States.*

[Doc. 39 at 3] (emphasis added).

Plaintiff's motion for summary judgment as to this claim is actually an

attempt to relitigate the previous ruling denying its motion to remand. It

argues that where only state law claims are alleged, no federal patent

claim lies and thus, subject matter jurisdiction does not exist in this Court.

In denying Precision's motion to remand, Judge Whitney previously held

that jurisdiction exists in this court pursuant to 28 U.S.C. §1338 because

the resolution of Precision's common law claim would require the resolution

and application of federal patent law. [Doc. 26]. This Court is not in a

position to overrule Judge Whitney on this point. His decision is the law of

the case. Hill v. BASF Wyandotte Corp., 696 F.2d 287 (4th Cir. 1982);

Prack v. Weissinger, 276, F.2d 446 (4th Cir. 1960); United States v. Whiting, 311 F.2d 191 (4th Cir 1962), cert. denied, 372 U.S. 935, 9 L.Ed.2d 766, 83 S.Ct. 882 (1963). "[L]ower courts cannot apply less rigorous law-of-the-case principles to interlocutory orders that implicate Article III subject matter jurisdiction." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 516 n.9 (4th Cir. 2003) (citing Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 118 (3d Cir. 1997)).

Moreover, it appears that Judge Whitney was correct in his ruling. A Federal District Court has jurisdiction over claims that appear to be exclusively state law claims, if those claims "arise under" patent law by turning on substantial federal patent law questions. See, e.g., Air Measurement Technologies, Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P., 504 F.3d 1262, 1269 (Fed.Cir. 2007) (legal malpractice claim that involves a showing of the rights to which the plaintiff would have been entitled pursuant to patent "arises under" federal patent law). Here, the Plaintiff asserted that it had been deprived of certain rights and revenues that would have arisen from its patent but for the alleged violations of state law by the Defendant. Plaintiff admits this in the highlighted portion of the quote from Plaintiff's brief above. Plaintiff thus invoked this Court's

jurisdiction. The Court thereby could properly dispose of the Plaintiff's claim and could hear the Defendant's defense and counterclaim based on the claimed invalidity of that patent.

The fact that all of Plaintiff's claims have now been dismissed does not alter the Court's jurisdiction over the Defendant's patent invalidity counterclaim. Whenever a claim arising under patent law is presented and the court disposes of that claim, the court is not divested of jurisdiction to hear a counterclaim that the patent in question was invalid. Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed. 2d 1 (1993). For these reasons the Plaintiff's Motion for Partial Summary Judgment must fail.

The Case Management Order entered in this matter [Doc. 17] states that a trial date will be set when the matter is ready. With the disposition of these motions the Court determines that this case is ripe for trial, and that it should be given a trial setting.

**ORDER**

**IT IS THEREFORE ORDERED** that the Defendant's Motion for Partial Summary Judgment [Doc. 30] is hereby **GRANTED** and Judgment will be entered in accord therewith at the conclusion of this case.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Partial Summary Judgment [Doc. 39] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the remaining claims in this matter shall be placed on the calendar for the mixed trial term in April, 2009, which is currently scheduled to commence on April 20, 2009.

Signed: December 16, 2008

Martin Reidinger
United States District Judge